Your argument in Howard Iten v. County of Los Angeles Thank you, your honors, and may it please the court. Two years ago, a panel of this court overtly stated that Iten's complaint was quote, sufficient to state a claim under the Contracts Clause, end quote. Yet we find ourselves here today arguing over that very issue, an issue addressed not only by a prior panel of this court, but also by two separate circuit courts, both of whom found, on pleading standards, that broad commercial eviction moratoria violated the Contracts Clause. This is because, in part, the substantial impact prong of the Contracts Clause is relatively easy to meet. I can point to case law from the 8th Circuit, the 2nd Circuit, the District of Massachusetts, and beyond in both residential and commercial contexts, both of which found that commercial and residential eviction moratoria broadly interfered with and impacted existing contracts throughout the country. I had a question on step one. What struck me as unusual was that both L.A. County and Lawndale had imposed, or said they were imposing construction on moratorium on evictions of commercial properties, and yet your client entered into a new five-year lease after, with full awareness that those eviction moratoriums were in place. How is it, then, that these laws undermined his contractual bargain, given that they were in place before he entered into the lease? Yes, Your Honor, I believe the timeline is extremely important here. So you are correct that Ms. Wrighton had an original lease with his tenant that expired in August of 2020 after Lawndale and the county had adopted moratoria. But neither of those moratoria applied to Mr. Iton at the time. The county's moratoria applied only to unincorporated areas, and the City of Lawndale's moratorium did not apply to Mr. Iton because his tenant did not avail himself of it. There were very specific requirements for the Lawndale moratoria that the tenant had to go through to receive that protection. The actual ordinance that applied to Mr. Iton didn't occur until September of 2020. His client, his tenant in that case, had already re-signed the lease and had actually even paid the first month's rent in that case, and we stated in our opening briefs that we can induce those additional facts as needed. But the contract had already essentially been entered into. Mr. Iton had not signed. That's true, but California law doesn't require that. There had already been a meeting of the minds. The contract existed. And then on September 1st, the county goes ahead and passes this large countywide moratorium on evictions. So up until that point, nothing applied to Mr. Iton, and we also don't think that foreseeability has to be determinative in this case. A party's reasonable expectations have never been solely determined on whether a substantial impact has occurred. Contract law has always given the meaning is established by the terms. And a breach of contract claim doesn't turn on whether or not it was foreseeable that a party would fail to perform. It operates instead on the terms of the contract itself. So the language in step one is whether it interferes with his reasonable expectations, and I guess you're saying technically they weren't applicable, but it's hard to say that. They didn't have an effect on what the expectations are reasonable. So what's your suggestion for that? Well, Your Honor, we don't think that they're determinative. And I can give the example of, for instance, if a landlord chose to rent to a tenant with poor credit, he wouldn't be foreclosed from seeking damages later on just on the grounds that it was foreseeable that his tenant may not pay. But even if reasonable expectations come into play under this fiend test here, which you are correct, that is the second prong, those reasonable expectations in that sense would have only lasted the two months of the original moratorium that they entered into. The September moratorium that the county agreed to enter into was only supposed to last until October 31, 2020. It then was extended multiple times, and it didn't even end. The forbearance period didn't end until 2023. It was entirely unforeseeable that this was going to last an additional three years. Entirely uncertain, perhaps, but was it really unforeseeable? I mean, you're old enough to go back to that era. Things were unsettled at least, but the fact that the county, the town or city, I forget whether Lawndale is which, were doing things like this and other communities all across the country were doing things like this, suggests that the possibility was on the table. So unforeseeable, I'm not sure it's quite as narrow as you're suggesting. Well, Your Honor, we're looking at commercial eviction moratorium. They were widely unpopular across the country. The county contests that, but the two cases… Unpopular enough that they didn't get enacted? Unpopular enough that they didn't get enacted, but they didn't exist. There wasn't the only two cases that dealt with commercial eviction moratorium, both of which found on the pleading standards that plaintiffs in those cases should survive, are out of New York, which is the Melinda Second Circuit case, and Heights Apartment out of the eight. I'm not asking questions about legal challenge. I'm saying was the moratorium foreseeable? And it's hard for me to say that it wasn't, given what was happening in the country at the time, what the county had enacted, what the city had enacted. Whether a commercial eviction moratorium, but you can also look at the inverse of that, Your Honor, and argue that for six months the county didn't apply anything to Mr. Eitens' property. What do you think foreseeable means? Certainty or possibility? It means possibility, but I would say… Okay, so why wasn't it reasonably possible to somebody looking around at that time that this kind of limitation would be imposed? Well, I think because if you look even a little bit broader, California State didn't have a commercial eviction moratorium. There was no federal commercial eviction moratorium. So that means it wasn't reasonably possible, and yet it happened, and how surprising could that have been? I think it could be very surprising, again. Why? Why very surprising? Why very surprising? Because Lawndale's, in fact, their moratorium was, in fact, applicable, even if his tenant didn't choose to take advantage of it. Lawndale's moratorium, his tenant didn't, again, Your Honor, you're correct, his tenant did not choose to take advantage of it. Can I ask what you mean by that? When you say he didn't take advantage of it, he wasn't paying his rent. What he didn't do, I think, is give notice or jump through the hoops of giving notice that he had COVID-related business interruption. But when you say he didn't take advantage of it, I just want to be clear that I'm understanding the facts correctly. He was behind in his rent. He was behind in his rent. Okay. So when you answered Judge Acuda's question, you meant about not taking advantage of it, that he hadn't given notice. He had not given notice, and that you were also requiring him to go on to a moratorium to supply evidence of your inability to pay. He didn't do that. He did neither of those things. Okay, but if you could circle back to Judge Acuda's question, I didn't mean to interrupt, but I want to make sure we're on the same page here, because her point was it did apply. It existed, but it was not applicable to his property. His tenant had not taken advantage of it, so there was no moratorium. It was applicable to his property. That's not the same as the tenant didn't take advantage of it. It did apply to that property, didn't it? Your tenant could have given the notice and so forth. It wasn't a question that your client's property was carved out, wasn't covered by the moratorium. The tenant could have taken advantage of it. That is correct. The moratorium did apply. The tenant may not have exercised his rights properly under it, but it did apply. So how is it not reasonably possible that that moratorium would be broadened? Your Honor, whether or not the county would decide to enact a moratorium that would apply to incorporated cities after Lawndale already had one, there might have been murmurings of it, but that does not go to say that there was something affecting his contractual rights at that moment, which is what the case law requires. You're moving to the standard, but you've agreed with me that foreseeability means possible, not certainty. And it's hard for me to understand how we could conclude that it was not possible that the county would do what it did. Well, Your Honor, again, possibility, certainty, we're operating on a sliding scale here for what it actually entails. No, we're not. We're looking at his expectations for performance under the contract, and Judge Okuda's point is a moratorium already applied, and the tenant was already in arrears. And if you even take that position, then it was only foreseeable that it would have lasted the two months. Three years. What's the hit? Is that the moratorium? What's the hit in your sentence? The moratorium that the county adopted in September of 2020, the one that actually. . . But in August, the tenant was already in arrears, and Judge Okuda's point is there was a moratorium that applied, the tenant just hadn't taken advantage of it. So, we're trying to figure out why there was a reasonable expectation, a contract expectation that the tenant would perform, because that's what we have to look at. We have to look at whether or not this moratorium interfered with his reasonable contract expectations. And that, you're missing me right there. You're losing me right there. Well, Your Honor, when you're looking at the reasonable expectations, you're looking at, again, what was possible, what could he have foreseen at that moment. And if you look at the actual case law that's been implemented specifically, I believe it's the Texaco case that specifically requires that type of foreseeability be predicated. I can find the actual quote for it. Oh, here. Examining substantial impact in terms of the contract and the industry generally, not on predicating changes in the law. So, when you're looking at reasonable expectations, you're not looking at what could apply in the future. You're looking at the industry generally. Take us back to September of 2020. I mean, I had oral arguments that month sitting at home, wearing a robe over shorts and bare feet, because that's what life was like then. And so, I have a hard time understanding why it wouldn't have been reasonably foreseeable to somebody at that point in time that these conditions were going to continue past October. And this kind of protection of commercial tenants might be continued. Well, Your Honor, again, looking at the case law, courts across the country have found that this was not reasonably foreseeable. Prospects of reduced cash flow, time value of missed rental payments, increased wear and tear on rental properties in both the residential and commercial context. And commercially, this goes more towards the second prong of the Contracts Clause analysis, but commercially, you're looking at something further removed from the stated goal of keeping people in their homes and stopping the spread of COVID-19. It's tougher in a commercial context. I'll grant you that. It's a much tighter means-to-end fit if you're talking about a residential premise, that's for sure. And in this case, there's at least the allegation that this tenant didn't even close up shop. Yes, Your Honor. He was an essential business. It was open throughout the pendency of COVID-19. I don't think your claim is frivolous. It is troubling, to be sure. But there was this moratoria in place that summer. I keep coming back to that. What's your best response to that? Your Honor, there was a moratoria in place that summer, and I think we're getting caught on what is applicable to Mr. Items' property. I think that's right. Why do you think it wasn't applicable? The tenant had not availed himself of it. He wasn't paying rent. He sort of had availed himself of it, at least documentally, if it's true that voting with your feet counts. I mean, he wasn't paying rent, right? He wasn't paying rent. So, the landlord is aware that there's a mortgage moratorium covering commercial property, and, in fact, his tenant has stopped paying rent. I think that those two things together would give you pause before you enter into a five-year lease, knowing that there is a moratorium, and your tenant isn't paying rent, and the tenant merely has to give notice and take those steps for a moratorium. So, it's hard for me to see how it wasn't reasonably expectable that the tenant would avail himself of the moratorium. That's correct, Your Honor. I mean, it is a question about why would you reenter into the lease, but if you think back to that time, he has a choice whether or not he's going to have a holdover tenant where you have no protection, you still can't get him out, or would you have a peace agreement with him? Why would he get him out? Is that because of the eviction moratorium? Well, the lease that he had lasted until August 30th. The new eviction moratorium came into place September 1st, you're looking at. Well, so it was reasonably expectable that he wasn't going to be able to get rid of this tenant. Well, he didn't know. Exactly what you're saying. He didn't know if he would be able to have the time to actually get the tenant out, but when you're looking at that, and you have to look at the fact that he was facing, potentially, if he was wrong, and the eviction moratorium did apply to him, he was facing severe criminal and civil penalties, which is what we were up against last time when we were before this court. Would you like to say something for me? Yes, Your Honor, I'd like to save my minute for a while. Thank you. Good morning. Mayor, Police, the Court, Edward L. Zanders on behalf of the County of Los Angeles. Your Honor, counsel started off by suggesting that this court has already determined there is a viable course of action. As I'm sure you're aware, the prior decision only addressed standing. This issue of the timing of the regulations actually came up as a fallback argument, and the court refused to go there, and so we're going to let the district court address that issue. And that's why we're here today, because the district court has addressed that issue. A couple things. You know, the comments that the Lawndale provision did not apply because somehow the tenant did not take advantage of it, they've alleged the same is true as to Mr. Iden under the county resolution, that he never complied with the notice rules. Either he's never paid rent, he's never complied with any notice rules, so I'm not sure where their argument is supposed to get them. In terms of the substantial impairment, they've identified four things. It's the fact that you can't recover late rent, you can't evict for nonpayment if it's COVID-related, you can't get your payments if it's COVID-related, and you have a period after the emergency ends to repay it, and in Lawndale it was six months, in the county it was 12 months. All of these quote-unquote substantial impairments, other than the slight difference between six and 12 months, are identical in both Lawndale and the county resolution. That's what their claim is about in terms of claiming substantial impairment. They are the exact same arguments, or exact same conditions. Money gives the county the right to say you can never collect interest. You mean the late fees? Well, no, I think it was more than late fees. I think I saw something that said interest. Money has time value, and apparently the county has decided to disregard that, to say not just extra late fees, but interest on late payments is something that can't be collected, as I understand it. Well, that's actually an issue that, because the same issue came up with the Los Angeles County moratorium that was addressed in the apartment association, and the Ninth Circuit looked at that and said, under the second prong, that that's not enough, that it's still reasonable and appropriate. But that's not really a first prong issue, that's a second prong issue. I mean, the first prong issue is the issue of foreseeability. Do you even get to that analysis? You started talking about is there substantial impairment, and it seemed to me, at least to that one piece, I understand what you said in our residential decision, but I never really understand why it is, but, I mean, so you brought it up. Okay, well, I mean, you raise it, we won't, but I brought it up as saying that issue exists under the Lawndale provision, and under the counties, it's under both. So my point is in terms of foreseeability, if it's an existing law, it's incorporated into the contract as part of the terms. If it's a new one, then you look at the nature of the regulation, is it the same type as before? So I think we're talking about two slightly different things. You know, there may be discussion under the second prong, but we're talking about the first prong where the Lawndale provisions and the county provisions are essentially the same. There's also discussion about the timing as to when all of this happened. The complaint alleges that the new contract commenced on September 1, which is the day that the resolution took effect. They're now coming back in their brief and saying, oh, we can amend this, and if we amend it, we're going to show that there were negotiations in August and that the tenant wanted to proceed forward and that the landlord's agent signed that agreement on September 15. So even under their own allegations, they now seem to be suggesting that you didn't even have a binding contract until September 15, which is clearly after the resolution. You're just talking as if there was a meeting of the minds in August. It doesn't matter. Well, I don't think there's a binding contract. I'm just trying to, if you could respond to her argument, her argument was different. Well, if there's a meeting of the minds in August, that's a time when the Lawndale ordinance plainly existed. There's an issue. The point was that she could amend to state that the contract for the new lease happened in August. She's not saying that it took place or was signed in August. No, she didn't. She was very careful to say there was a meeting of the minds in August and it wasn't amended until September. Okay. But, again, there was no signed contract under her analysis until September. In non-pandemic circumstances, leases that began on September 1st have almost certainly been agreed upon before that date. So I think that's really all she's trying to say, and it's pretty plausible to me. Well, and I agree with that. It probably was negotiated beforehand, but in terms. I need to respond to her position, because if you just take it as a hypothetical, at least two of us think that's pretty plausible. So how does that change your arguments? One day or not, we're looking at contract, you know, reasonable expectations for performance. Ultimately, at the end of the day, I don't think it changes anything. Okay. I need you to respond and explain why that would be helpful. Well, because if you're talking about August, the loan deal ordinance is in effect and applies and would be incorporated within whatever agreement they're talking about. If you're talking about September, the county resolution applies and is incorporated within whatever agreement they're talking about. Is there any reason why, having not actually taken advantage of the loan deal moratorium, it would be foreclosed from taking advantage of it, say, in September? The tenant. So her point is the tenant did not take advantage of the loan deal moratorium when the agreement was reached. I think she's saying that the tenant didn't comply with the loan deal moratorium and the tenant also didn't apply with the county moratorium. But could the tenant have done so after the new lease? Well, I guess, again, I'm confused as to what your question is. I mean, could the tenant have complied? I don't think the tenant ever paid rent at any moment. Could the tenant have given written notice that the reason for not paying the August rent was COVID-related financial distress? Is it your position that that notice would have had to happen in early August? The tenant has never given any notice at all. I understand. That's why I'm asking a different question. I don't think it would have made a difference if the tenant did it in August or September or at any moment. So any time that the loan deal moratorium was in effect at any time, the tenant could have provided notice to the landlord and gone through it or other procedural hoops there were to protect his nonpayment of rent. Is that right? I don't know the answer to that because I think that that's beyond this record in terms of what we know is that the tenant never paid rent. The tenant never complied with any notice provision under any resolution. Presumably, if the tenant was asked to come up with evidence or could you have come up every single month under the county resolution and given notice of an inability to pay, presumably, they could have. I don't know why. If they could comply, they didn't, but the landlord certainly never sought to enforce that. We don't know that on this record. Another point I'd like to make is there seems to be a focus that the county resolution was to expire in October 31. Judge Clifton said that's really not the issue. I think the question in terms of foreseeability as of the time this contact is being entered is is it foreseeable at that point that this pandemic could continue? And there's tremendous uncertainty, as you said. The Lawndale ordinance, the county ordinance, they're all tied to the existence of the emergency. And so the question, is it foreseeable that this emergency could continue past October? And, of course, it was. And there's tremendous uncertainty. And we don't know at that point how long this is going to last. Yet he chose to enter into a new contract. And if he had not, it would have been a fault situation, where under the county resolution under Lawndale, he could have kicked them out because they only protect nonpayment of COVID plus no-fault evictions. And that would have been a fault situation. So the tenant would have had no right to stay any longer. There's comments that have been made that this is not foreseeable, as the court said. It certainly was in California. When the county passed the resolution, it conducted a survey of incorporated cities within L.A. County. 31 of 34, including Lawndale, had commercial evictions. There were commercial eviction provisions all over California at the time. And that's what matters. It's not what's happening elsewhere in the country. There's been comments. You said commercial eviction provisions. Do you mean moratorium? Sure. I mean, there's a lot of different restrictions. But, yes, the moratorium. Yeah. There's also been comments that every case that's out there has found that these commercial moratoriums are unlawful. It makes it sound like there's a large body of case law going the other way. I don't know what opposing counsel is referring to. The only case that you mentioned was Melendez. Melendez is dealing with a personal guarantee. And what the court looked at was the fact that that was a permanent bar, that you would never be able to enforce a permanent guarantee at any moment if the nonpayment was because of COVID. And the court said there's a tribal issue under Stevens and Second Prong, given that permanent bar. That has nothing to do with the commercial moratorium that we are talking about today. The only case I know of that has actually looked at commercial is the Walls case, which is a San Diego decision cited in our papers. That was affirmed by the Ninth Circuit on takings grounds. It was a different analysis. They didn't reach the contract clause issue. But that is one where they looked at it and upheld the resolution against the contract clause challenge, and that's the only one I know of. And part of the reason, I think, for the difference in why we have so many cases, residential versus commercial, is because, one, you typically have existence of personal guarantees when you're talking about commercial. And, two, the government, through the Small Business Administration, poured billions of dollars into the commercial market to protect not just tenants but also commercial landlords. And as long as you applied that money toward rent and toward keeping your employees, you were able to turn that into, essentially, a grant. So there is a sort of difference in the case law that's out there. Most of the cases are dealing with residential, but I think that's the reason for it. At this point, I don't know if the Court has any questions for me. Apparently not. I will submit. Thank you. Thank you. You have some time for rebuttal. Thank you, Your Honor. I have 59 seconds, so I'll be brief. First, dealing with whether or not the panel had an opportunity to rule on this, we were in a weird procedural posture last time because it was a 12B6 motion dealing with 12B1. But the panel had the opportunity to rule on the 12B6, and it was very clear in its statement. It said, quote, in sum, at least for the purposes of filing a complaint, has alleged the obligations of his contract have been taken away or materially lessened. That is sufficient to state the claim under the Contracts Clause. Dealing with the Lawndale Ordinance, I'd ask this Court to look at the request for judicial notice. It has the Lawndale Ordinance in it, Exhibit 4. That was very different from the county of moratorium that was adopted, too. And the significant difference is being with the late fees and interest. That, again, were 100% taken away and lost, just like the personal guarantee in Melinda's. Melinda's Heights Apartment Association are two circuit court cases dealing with commercial eviction moratorium. In the Bowles case, that didn't even discuss the difference between commercial and residential moratoria. It only dealt with Mooney's Grounds and the Takings Clause. It did not discuss it in the Contracts Clause case. So I'd be to ask this Court to reverse in Mr. Wright's favor. Thank you. The case of Howard Height v. County of Los Angeles is submitted, and we're now adjourned for this session. All rise.
judges: CLIFTON, IKUTA, CHRISTEN